**C. T. C. INV. CO. v. DANIEL BOONE COAL CORPORATION.**

**CHICAGO TRUST CO. et al. v. DANIEL BOONE COAL CORPORATION et al.**

Nos. 3871, 3881.

District Court, E. D. Kentucky.

July 31, 1931.

See also 58 F.(2d) 303.

Fisher, Boyden, Bell, Boyd & Marshall, of Chicago, Ill., for plaintiff.

Earl K. Schiek, of Chicago, Ill., for Daniel Boone Coal Corp.

Chas. S. M. Krumm, of Columbus, Ohio, for trustee.

W. A. Stanfill and Faulkner & Faulkner, all of Hazard, Ky., for Crawford.

Henry S. McGuire, of Lexington, Ky., for Fields.

ANDREW M. J. COCHRAN, District Judge.

This suit is before me on the petition of L. D. Crawford, Austin Fields, Martha Grigsby, and Louie Couch for an order directing the receiver herein to turn over or to pay, as hereinafter more fully set forth. The facts upon which this petition is based are these:

April 29, 1913, the petitioner L. D. Crawford and wife, and the petitioner Austin Fields and wife, Joseph Fields and wife, Callie Fields, the petitioner Martha Grigsby and husband, and the petitioner Louie Couch executed to the North Fork Coal Company a coal mining lease for the term of 25 years on a tract of 150 acres of land in Perry county in this district. It is likely that the land was jointly owned by the lessors, one-half by the petitioner Crawford, and the other half by the other lessors, but it is possible that separate portion or portions thereof were owned by the lessors respectively. However this may be, the lease was a joint lease of this one body of land for coal mining purposes. By it the lessee covenanted and agreed to pay to the lessors a rent or royalty of ten cents per ton, and to mine and remove from the premises beginning May 1, 1914, sufficient tonnage of coal to amount to a minimum rent or royalty of $208.33, and $2,500 per year to be paid to the lessors from month to month whether the lessee removed enough coal to pay or amount to the minimal rental or not. A lien was retained to secure payment thereof on all mining machinery and mining property of the lessee placed on the leased premises, including mines, roads, tramways, railroad tracks, which should attach to all property placed on the leased premises. It was further agreed therein that one-half of the minimum rent and one-half of all the royalties should be payable monthly to the lessor Crawford, and one-half to the other lessors, or as they might direct.

The right to this lease passed by assignment to the Daniel Boone Coal Company, whose name was subsequently changed to Boone Mining Company. This happened prior to May 1, 1924, and prior to that date the defendant Daniel Boone Coal Corporation took possession and operated the leasehold under some arrangement with that company which continued until after May 1, 1928. The lessors claimed that, by reason thereof, defendant had become liable to them for the minimum rent or royalty which was denied by it. On September 4, 1925, the lessors, except Callie Fields, who likely had died and whose interest likely had passed to others of that group, brought suit in equity in the circuit court of Perry county against the Daniel Boone Coal Corporation to recover $2,500, the minimum royalty for the year ending May 1, 1925, which was unpaid, and interest thereon from that date, and for the enforcement of the lien to secure same. In August, 1926, an amended petition was filed setting up the maturity of the minimum rent due May 1, 1926, and its nonpayment, and seeking judgment for it as well as that due May 1, 1925. A second amended petition was thereafter filed setting up the provision of the lease that one-half of the minimum royalty was payable to lessor Crawford and the other half to the other lessors. A third amended petition was filed after May 1, 1928, setting up the maturity and nonpayment of the installments of rent due May 1, 1927, and

May 1, 1928, and sought judgment for them and interest from date of maturity as well as the other two installments. The prayer of this pleading was for judgment against the two defendants, Daniel Boone Mining Corporation and Boone Mining Company, for the sum of $2,500, subject to a credit of $71.-80, with interest on same from May 5, 1925, and the further sum of $2,500, with interest thereon from May 1, 1926, and the further sum of $2,500, with interest thereon from May 1, 1927, and the further sum of $2,500 with interest thereon from May 1, 1928; and in their petition prayed "for all proper and equitable relief to which they may be entitled."

The question as to the defendant Daniel Boone Coal Corporation's liability for these four installments of minimum rent was litigated in that suit and decided adversely to it. On March 13, 1929, the circuit court of Perry county rendered a judgment therein against the two defendants in favor of the petitioners herein. One of the plaintiffs therein, Joseph Fields, had died, and the suit had not been revived in time as to his interest. By that judgment the suit as to his interest, which was one-fourth of one-half, was dismissed without prejudice. It was adjudged therein that the plaintiffs named in the caption, i. e., all the plaintiffs including Joseph Fields, recovered of both defendants "the minimum royalty actually shown by the evidence to be due to the plaintiffs by reason of the said lease contract from May 1, 1924 to May 1, 1928, inclusive, to be divided among the plaintiffs as their interest in and as set forth hereinafter." It was further provided that the plaintiff Crawford so recover "the sum of $1250 with interest thereon from the first day of May 1925, subject to a credit of $112.-25, one half of the amount of the coal actually mined and paid for as claimed by the defendants, to be credited as of the first day of May 1925 and * * * the sum of $1250 with interest thereon from May 1, 1926 and the further sum of $1250 with interest thereon from May 1, 1927, and the further sum of $1250 with interest thereon from May 1, 1928 and his costs herein expended," and that the plaintiffs Austin Fields, Louie Couch and Martha Grigsby so recover "the sum of $937.-50 with interest thereon from May 1, 1925 subject to a credit of $84.26 representing their three fourths of the money actually paid to them as contended by the defendants for coal actually mined from the leased premises to be credited as of May 1, 1925 and * * * the further sum of $937.50 with interest

thereon from May 1, 1926, and the further sum of $937.50 and interest thereon from May 1, 1927, and the further sum of $937.50 with interest thereon from May 1, 1928 and their costs herein expended, this not representing any part of the royalties which are provided in the lease to be paid to Joseph Fields, but represents three fourths of the minimum royalty, for which each and all of the plaintiffs may have execution against both the defendants * * * without prejudice to their lien hereinafter adjudged." Concerning the lien, it was adjudged therein that plaintiffs had a lien "upon all of the property of every kind, class and character belonging to or claimed by either of the defendants * * * consisting of houses, steel mine cars, ties, mining equipment, motors, copper wire and every other class or kind of property on or used on or in connection with the mining of the coal upon the hereinafter described tract of land, whether specifically mentioned or described herein or not and * * * upon the said lease contract and all the rights and privileges of the defendants— to secure to them the payment of the sum herein adjudged to each of the plaintiffs."

On the 15th of June, 1929, a writ of execution issued from the office of the clerk of the circuit court of Perry county, and on the 17th of June, 1929, it was delivered to the sheriff thereof for collection. It commanded him "of the estate of the Daniel Boone Coal Corporation and the Boone Mining Company that he cause to be made the sum of $1250 with interest from May 1, 1925 subject to a credit of $112.35 as of May 1, 1925 * * * and the further sum of $1250 with interest from May 1, 1926, and the further sum of $1250 with interest from May 1, 1927 and the further sum of $1250 with interest from May 1, 1928, which L. D. Crawford hath recovered against them for debt in our Perry Circuit Court * * * and the further sum of $937.-50, subject to a credit of $84.25 with interest from May 1, 1925; and the further sum of $937.50 with interest from May 1, 1926, and the further sum of $937.50 with interest from May 1, 1927 and the further sum of $937.50 with interest from May 1, 1928 which Austin Fields, Louie Couch and Martha Grigsby in our Circuit Court of Perry County hath recovered against them for debt whereof the defendants are convicted as appears to us of record and * * * have that money before the said court on the 5th day of August 1929 to render to said L. D. Crawford and Austin Fields, Louie Couch and Martha Grigsby the debt, interest and costs aforesaid,

and have then and there this writ." There was a notation on the writ that the costs amounted to $100.

At the time the writ came into the sheriff's hands, the defendant Daniel Boone Coal Corporation owned and possessed a commissary located on property adjacent to the leased premises at Lennut in Perry county, about one mile by rail from Hazard, the county seat, and a stock of goods and merchandise therein, and also mining houses and mine equipment on the leased premises. The sheriff, on June 18, 1929, the day after the receipt of the writ, mailed written notice thereof to the defendant, and thereupon its representatives, together with its attorney in the litigation, which resulted in the judgment, appeared at the sheriff's office and assured him that the execution would be taken care of in due time. Becoming concerned about its nonpayment, the sheriff visited Lennut on July 2d, made a survey of the commissary and its contents. At the same time he went to the drift mouth on the leased premises and took note of the mining equipment so far as it was observable. On the same day he made this indorsement on the writ: "This execution is levied upon one stock of merchandise ware and fixtures, also all the mining machinery and equipment of the Boone Mining Company at Lennut, Ky., and the Daniel Boone Coal Corporation at Lennut, Ky., this July 2nd, 1929. Wm. Cornett, S. P. C. by S. C. Cornett, D. S."

On the same day the sheriff mailed a written notice of the levy to the defendant, and thereupon its principal representative in this state and its attorney appeared at his office and talked about the matter. According to the testimony of the sheriff, he said this to them: "I have levied that execution today and the 5th day of August is return day and if this execution is not paid by the 5th day of this month after I shall return this execution, I shall go out and take into my custody the property that I have levied upon, but in order to afford you all the courtesy I can reasonably I am going to leave this property in your custody and I shall expect you to take care of this property and preserve it."

This is somewhat ambiguous. It related to an important phase of the case and should not have been left in that shape. I make it out that the sheriff notified these representatives of defendant that if the execution was not paid by August 5th, the return day, he would take the property covered by the indorsement on the execution into his actual custody, and that in the meantime he would leave it in the defendant's custody to hold

for him. He was not asked as to whether defendants' representatives agreed to this, but such may be taken to be the effect of his testimony.

Nothing more transpired until the early morning of August 5, 1929, the return day of the execution. At that time the bill in the first of the two suits named in the caption hereof was filed with me in my chambers at Maysville. It was filed at 9:15 a. m. Eastern standard time, which governed there, or 8:15 a. m. Central standard time, which governed in Perry county. The bill was a creditor's bill; the plaintiff being a judgment creditor in the amount of $30,000. It sought the appointment of a receiver. The defendant filed an answer consenting thereto and praying therefor, and thereupon the receiver was appointed. The receiver so appointed was a lady stenographer in an adjoining lawyer's office. The appointment was a temporary one, and was made to meet the necessities of plaintiffs' case, which was to have a receiver appointed by this court before the sheriff could actually take custody of the property on which he claimed to have levied the execution, as he had said to defendants' representatives, as hereinbefore recited, he would do if the execution was not paid before that day. It was alleged in the bill "that judgment was recovered by L. D. Crawford et al. on March 13, 1929 in the Circuit Court of Perry County as aforesaid in the sum of Eight Thousand Five Hundred, Fifty Three dollars and nine cents ($8553.09) and accrued interest and that such judgment creditors your petitioner is informed and believes threaten to levy execution therefor on the stock of merchandise and other property of the defendant." Receiver was appointed of all of the defendants' property. She was given full power and authority to collect and reduce the same to possession, and directed, authorized, and empowered immediately so to do. It was provided in the order of appointment as follows, to wit: "All persons having any property of said defendant in their possession or under their control are hereby ordered and directed to deliver same forthwith to said receiver. It is further ordered that all persons be and they are hereby enjoined from interfering with said receiver in the possession of said property and with the administration of her trusts and in the performance of her duties imposed upon her as such receiver."

She accepted, and was qualified at once, and an attorney was appointed for her. Thereupon her attorney so appointed sent this telegram to the sheriff of Perry county:

"United States District Court, Eastern District of Kentucky, has appointed Receiver of the Daniel Boone Corporation and enjoined all persons from interfering. You are warned not to levy on or molest any property of such corporation."

The sheriff received this telegram early on the morning of that day, the 5th of August, before he had done anything towards taking actual custody of the property, which he claimed to have levied upon, and after he received the telegram he did nothing to that end. On the next day, August 6th, he received from the attorney of the receiver a copy of the order of appointment. In the letter which it accompanied, the attorney said: "I wish to confirm the telegram which I sent you yesterday from Maysville, Kentucky, as follows—For your information I am sending herewith a certified copy of Judge Cochran's order appointing a receiver for all the assets and property of the Daniel Boone Coal Corporation which order was entered and the receiver qualified at 9:15 A. M. Eastern Standard Time."

Thereupon the sheriff made this indorsement on the execution: "This execution returned. The levy endorsed hereon is stayed. The defendant Boone Mining Company and the Daniel Boone Coal Corporation in hands of receiver in the U. S. District Court of Eastern, Ky."

According to the testimony of the sheriff, who was a competent judge in such matters, the stock of goods and merchandise in the commissary at the time the execution was in his hands was worth at least $10,000. It had been inventoried on June 30, 1929, and, according to the inventory, it amounted to $12,510.32. Between July 2 and August 4, 1929, the sales out of the stock amounted to $5,786.35 and the additions thereto amounted to $5,702.33. The equipment on the leased premises was valued at $14,140.

Such then are the facts on which the petitioners base their right to the relief which they seek. That relief may be stated more specifically to be that the receiver herein, successor to the original receiver, be ordered and required to turn back to the sheriff of Perry county the goods, wares, merchandise, and fixtures in the commissary, and the equipment and houses on the leased premises at the time of the appointment of the original receiver and which he took possession of, and, if same are not now on hand, to account for their value to the extent of their judgment.

The plaintiffs urge several grounds upon which they claim that the petitioners are not entitled to the relief they seek. I will take up and dispose of each one of them.

1. The execution was void. This is so because it was a joint execution on two separate judgments. They cite, in support of this position, the following decisions, to wit: Merchie v. Gaines, 5 B. Mon. (Ky.) 126; Stuart & Palmer v. Heiskell's Trustee, 86 Va. 191, 9 S. E. 984, 985; Cohen v. Menard, 31 Ill. App. 503; Doe v. Rue, 4 Blackf. (Ind.) 263, 29 Am. Dec. 368; Stewart v. Morrison, 81 Tex. 396, 17 S. W. 15, 17, 26 Am. St. Rep. 821; Bain & Wyatt v. Chrisman, 27 Mo. 293; Bigham v. Dover, 86 Ark. 323, 110 S. W. 217.

To determine whether these decisions support this position, a generalization of them is essential to ascertain just what they stand for and all they do stand for. Beyond question they do stand for the position that a joint execution on separate judgments is void. I would, however, drop the word "joint" and put the matter thus: A single execution on separate judgments is void. Certainly it is defective. In the case of Dugan v. Harman, 80 Kan. 302, 102 P. 465, 133 Am. St. Rep. 209, it was held by a divided court that such defectiveness renders the execution voidable only, not void. According to these decisions it is void. Two of them cannot be accounted for on any other ground. They are those in the cases of Merchie v. Gaines and Bigham v. Dover. In each case the question presented was whether a purchaser under such an execution acquired title to property sold under it. It was held that he did not. This could only be so on the ground that the execution was void. In the case of Merchie v. Gaines, it was said: "The sale was consequently void and the defendant obtained no title by his purchase and deed."

In the case of Bigham v. Dover, it was said: "A joint execution upon two separate judgments is not voidable merely but void. Merchie v. Gaines, 5 B. Mon. (Ky.) 126: Doe v. Rue, 4 Blackf. (Ind.) 263, 29 Am. Dec. 368. Such an execution is defective, not in form merely, but also in substance, and is therefore not susceptible of amendment."

It further said that the execution in that case, because it was a joint one, issued upon two separate judgments, was "absolutely void," and, further, "Appellee acquired no title by his purchase at a sale under the void execution."

It is well, in this connection, to bring out the reason put forth for this position. Why is it that such an execution is defective and by reason thereof void? In some of these de-

cisions it is based on the ground of variance. It so happened in those cases that the execution recited that it was issued on a single judgment, when, as a matter of fact, it was issued on two separate judgments. In Merchie v. Gaines, it was said: "The doctrine has been long since well settled, that to sustain a sale of land under execution, there must be a valid judgment or decree. The purchaser to make out title, must not only produce the execution, but the judgment. The execution in this case purports to have been issued upon a decree in favor of Fowler & Winslow. No such decree is produced, but separate and distinct decrees for the costs of each."

In Cohen v. Menard, it was said: "The execution must follow the judgment, and to include two separate and distinct claims as two several judgments in one execution as one judgment for amount of both claims renders the execution fatally defective for variance from the judgment."

In the case of Doe v. Rue, it is said: "The variance is fatal."

But the reason for this position goes deeper than this. Even if there was no variance, i. e., if the execution recited that it was issued not on a single judgment, but on two separate and distinct judgments, thus conforming to the fact, still it would be void. The true ground for the position is that there is no authority for the issuance of a single execution on two separate and distinct judgments.

In the case of Merchie v. Gaines, it was said: "The Clerk had no authority to blend or unite them, and issue a joint execution for the aggregate amount of costs in both decrees."

And again: "We know of no law or rule of practice which authorizes a joint execution upon two separate judgments or decrees."

In the case of Doe v. Rue it was said: "The judgments in favour of Jeffries and Smith are not joint but several, and they are no authority for the execution under consideration."

Another position to be gathered from these decisions is that it is immaterial as to who are the parties to the separate judgments. The doctrine applies where the parties to the separate judgments, both plaintiffs and defendants, are the same as where such is not the case. In the cases of Merchie v. Gaines, Doe v. Rue, and Bain & Wyatt v. Chrisman, the plaintiffs in the separate judgments were different, but the defendants were the same. But in the cases of Cohen v. Men-

ard and Bigham v. Dover, both plaintiff and defendants were the same in each judgment. Freeman on Executions (3d Ed.) vol. 1, § 16, p. 48, doubts whether this is sound. He says: "Whether in the event of two or more judgments being entered in favor of the same plaintiff and against the same defendant in a single execution may be issued upon both is a question which has been little considered. In Illinois when a single execution issued upon two claims against an estate the court said 'The execution must follow the judgment and to include two several and distinct claims as two several judgments in one execution as one judgment for the amount of both claims renders the execution fatally defective for a variance from the judgment.' It will be observed that this language is addressed to the supposed variance rather than to the question whether the two judgments might have been enforced in a single execution, had this been appropriately described therein. In Louisiana on the other hand, it has been held that two decrees foreclosing mortgages upon the same property may be enforced by a single execution."

The decision in the case of Poor v. Hudson, 4 Ky. Law Rep. 349, is possibly to the same effect. It was there held that a single execution issued for the aggregate amount of two bonds executed for the purchase money of land sold under a decree in equity is valid; both bonds being due and both payable to the commissioner. A judicial sale bond in this state has the force and effect of a judgment, and if not paid may be collected by execution. If the two sale bonds in this case may be viewed as two separate and distinct judgments, then this case is authority for the position that, where the parties plaintiff and defendant are the same in separate and distinct judgments, a single execution may issue on them to collect the amount due on all.

But the important thing for one to understand in applying the doctrine that a single execution on separate and distinct judgments is void is whether the case in hand is one involving separate and distinct judgments. What do these decisions have to say on the question as to what is essential to make a case of separate and distinct judgments? One gathers from them that judgments rendered in separate and distinct cases are themselves separate and distinct. The cases of Cohen v. Menard, Doe v. Rue, Bain & Wyatt v. Chrisman and Bigham v. Dover, were all cases where the judgments held to be separate and distinct were rendered in separate and distinct cases. In Cohen v. Menard, a credi-

tor filed two claims against an estate which were allowed on the same day as separate claims. This is the Illinois case referred to by Freeman. It was said: "Where a claim is filed and allowed against an estate, it becomes a judgment."

The case was the same as it would have been had the claims been against an individual, and two distinct and separate actions had been brought against him at the same time, in each of which a judgment was rendered against him. In Doe v. Rue it was said: "The two judgments—one in favour of Jeffries for $127.03, the other in favour of Smith for $187.96—are entirely distinct, and have no dependence on each other."

I do not have this report before me, and I take it that these two judgments were rendered in separate proceedings against the judgment defendant. In Bain & Wyatt v. Chrisman, there were two judgments entered by a justice of the peace against the same garnishee. I take it that these judgments were rendered in separate and distinct proceedings against the defendant whose effects had been garnisheed. In Bigham v. Dover, there were two judgments entered in different suits in favor of the same plaintiff against the same defendant. If I am correct in this statement of the facts of these four cases, neither one of them has any help to give in disposing of the vital question as to whether what plaintiffs claim to have been two separate and distinct judgments were in fact such within the doctrine that a single execution on separate and distinct judgments is void. They may therefore be laid aside in the future consideration of the question. What then have the decisions in the other three cases, to wit, Merchie v. Gaines, Stuart & Palmer v. Heiskell's Trustee, and Stewart v. Morrison to say? As to the case of Merchie v. Gaines, it may be said that the separate and distinct judgments there involved were in a sense rendered in the same case. The devisees of William Bullock, partners of certain land, brought suit against John Fowler and Bruce Winslow to perpetuate testimony in reference to the land. Fowler answered the bill. Winslow was not brought before the court. The case was heard as to Fowler, and the bill was dismissed as to him, and he was given a decree for his costs. The case was continued as to Winslow. At a subsequent term the suit was dismissed as to him for want of prosecution, and he was given a decree for his costs. These two decrees for costs were held to be separate and distinct so as to render the single execution issued on both void. The court said: "These decrees, it is true, were rendered in the same case, but they were rendered at different terms of the court, and are virtually as wholly unconnected with each other as if rendered in different suits."

We have no such case here. What plaintiffs here claim to be separate and distinct judgments can be said, more certainly than there, to have been rendered in the same case, and they were rendered at the same term of court and are covered by the same entry. This case, therefore, is like the other four. It gives no help on the vital question in hand. It too may be laid aside.

What is relied on in the case of Stuart & Palmer v. Heiskell's Trustee is set forth in this brief extract from the opinion therein: "The next and only other assignment of error by the appellants, which is that it was error to direct execution to issue severally in favor of Heiskell's trustee and Massie's administrator for the sums, decreed to them, respectively, is also not well taken. Both were complainants before the court,—one in the original bill, the other in the cross-bill,—and the provision in the decree giving them the right to have execution severally is both proper and in accordance with the usual practice in such cases."

There is nothing to be gathered from this as to what would have been the holding had such direction not been given and had the question been as to the right to have a single execution issue for both sums, or as to the right of the court to have given a direction for such an execution to issue. The question decided was simply as to the right of the court to give a direction for execution to issue severally. Then, though the decrees were in the same case and likely covered by the same entry, they were based on separate and distinct bills; one in the original bill, and the other on the cross-bill. We have no such case here. Both sums were adjudged on the same bill. This case too can be laid aside as of no help in disposing of the vital question in hand.

The last case to be considered is that of Stewart v. Morrison. That was a joint suit by two distributees of an estate on the bond of the personal representative to recover their respective shares thereof as ordered by the probate court to be turned over to them. There was no question involved as to any execution. It was solely as to the validity of the judgment which had been rendered there. The judgment was for a certain sum, "one half to each of said plaintiffs," and it was provided that each might have execution.

312

The sureties appealed from the judgment and urged that the judgment was erroneous in that it was a joint judgment when the petition declared on separate causes of action. The court said: "This objection to the judgment is not good. It distinctly states the amount each one of the plaintiffs is entitled to and executions may issue in favor of each for one-half of the whole amount and accrued interest."

A mere statement of this case is sufficient to indicate how far away it is from the case in hand.

■ The result of this consideration of these seven decisions is that they were of no value whatever in determining what I have characterized as the vital question here, i. e., whether what plaintiffs claim were separate and distinct judgments were in fact so. Not a single decision has been cited in support of that position. Nor has anything been advanced calculated to aid in the solution of the question. Indeed the plaintiffs have assumed that this is a case of two separate and distinct judgments, when the question is whether such is the case. In so doing they have begged the question. Of course if such is the case the execution was void, and the decisions cited uphold this position. They have no bearing whatever on that question. What we have here is an adjudication that the different plaintiffs, to wit, Crawford on the one hand, and Fields, Couch, and Grigsby on the other, recover of the defendant separate and distinct sums of money. It is a single adjudication covered by a single entry made in a single case. It is claimed that there are two separate and distinct judgments because there is an adjudication of separate and distinct sums in favor of separate and distinct plaintiffs. But a single adjudication of separate and distinct sums does not create a separate and distinct judgment as to each sum. This is evident if the adjudication as to each sum is in favor of one and the same plaintiff. No one would say that in case of an adjudication that a plaintiff recover of a defendant a specific sum of money and his costs that there were two separate and distinct judgments, one as to the specific sum and the other as to the costs. Nor would one say that an adjudication in a single case that the plaintiff recover of the defendant separate and distinct specific sums of money as well as the costs that there was a separate and distinct judgment as to each sum, and that whether the adjudication is based on a single obligation or on several separate and distinct obligations. It would seem that in such a case a separate execution could not issue for

each sum, but only a single execution for all the sums and the costs. In 23 C. J. 315, § 17, it is said: "Plaintiff cannot divide his judgment and take out separate executions for different portions thereof. Thus, a money judgment being entirely separate, executions cannot issue on each of the counts of the complaint although there were finding and judgment on each count separately."

Had Crawford for instance been the sole lessor and plaintiff, and recovered a judgment against the defendant for the minimum rent of each of the four years involved and his costs, he could not have had a separate and distinct judgment for each of the four years. He would have had but a single judgment on which a single execution could have issued for the collection of the whole amount adjudged.

Such being the case, how can it make any difference that the sums adjudged are in favor of separate and distinct plaintiffs? Why, in such a case, is it to be said that there is a separate and distinct judgment in favor of each plaintiff when in the other case there is not a separate and distinct judgment in favor of the one plaintiff as to each sum? The necessities of this case do not require that I take the position that in every case of an adjudication by a single entry in a single case on a single pleading of separate and distinct sums in favor of different plaintiffs there is but a single judgment on which a single execution can issue. I do not have in mind all the possible cases of this sort that can arise, and I would not unnecessarily take such a broad position. But certainly in every such case if the rights of the several plaintiffs arise by one and the same obligation, and they have the right not only to sue jointly but to seek a joint or several judgment, such an adjudication is a single judgment on which a single execution can issue. It has been held that in an action by a single plaintiff against several defendants on one obligation a single execution can issue on a judgment against some of them obtained at one time and one obtained against the others at another time. In the case of Walker v. Com., 18 Grat. (Va.) 13, 98 Am. Dec. 631, a suit was brought against a principal and his three sureties. Process was first served on the sureties, and judgment taken against them. It was afterwards served on the principal, and judgment taken as to him. It was held that the plaintiff was entitled to take out a single execution on both judgments. The court said: "The Commonwealth had a right to have her motion against the sureties continued until the notice was served on the principal, and

then to take a joint judgment against all; or she had a right to take several judgments against the sureties and the principal, as they were respectively served with notice, as she did; and she might lawfully have sued out several executions on the judgments as they were obtained. But she chose to wait after getting judgments against the sureties until she had also gotten judgments against the principal in the joint proceeding against all, and then to sue out joint executions against all. I can see nothing objectionable in this, and certainly nothing of which the plaintiffs in error have any reason to complain."

It is to be noted that, according to this statement, it does not follow that, because separate executions may issue on a judgment for separate amounts, a single execution cannot issue for all of them.

Here Crawford, the Fields, Joseph and Austin, Couch and Grigsby had the right to join in the suit in the Perry circuit court, and, if entitled to a judgment at all against the defendants, were entitled to a joint judgment for the sum of $2,500 a year for each of the four years it was behind in the payment of the minimum rental. By the lease of April 29, 1913, the lessee first covenanted and agreed to pay to the lessors, i. e., to them jointly, a rent or royalty of 10 cents per ton, and to mine and remove from the premises beginning May 1, 1914, sufficient tonnage of coal to amount to a minimum rent or royalty of $208.33, and $2,500 per year to be paid to the lessors from month to month whether the lessee removed enough coal to pay or amount to the minimal rental or not. It is true that later on in the lease it was agreed that one-half of the minimum rent and one-half of all the royalties should be payable monthly to the lessor Crawford, and one-half to the other lessors, or as they might direct. But the sole effect of this provision was to render the lessee's obligation to pay severally as well as jointly. In the case of Schrage v. Hutt (Mo. Sup.) 252 S. W. 658, 660, the contract sued on was to pay "the sum of ten thousand ($10,000) dollars to the said Zula Z. Schrage and Mary C. Lowe, being the sum of $5,000 to each of them." The court said: "We think the contract was joint and several, and that both plaintiffs could sue jointly for the whole $10,000, or severally for $5,000 each. The agreement was to pay both together $10,000, or each severally $5,000, and we see no objection to the plaintiffs bringing suit according to the promise contained in the contract."

The plaintiffs not only joined in that suit, but by their petition sought judgment in favor of themselves jointly for $2,500 for each of the four years. It is suggested that the reason why a judgment was not entered in favor of all the plaintiffs jointly for the whole amount due for each year was that Joseph Fields, one of the plaintiffs, had died, and the action had not been revived as to him. But the judgment could have been for $2,187.50 for each year, with the provision that the plaintiff Crawford was entitled to $1,250 thereof, and the other three plaintiffs to $937.50. However this may be, it is not open to say that, by reason of the judgment having been as it was, it was a separate and distinct judgment in favor of Crawford for $1,250 per year, and one in favor of the other three for $937.50, within the meaning of the doctrine that a single execution cannot issue on separate and distinct judgments. It would be strange indeed that a single execution cannot issue on a judgment for two separate sums in favor of one of two plaintiffs as to one sum, and of the other as to the other sum; the right of the two plaintiffs arising by virtue of the same obligation and being sought to be enforced by them in one and the same action, and the judgment being covered by a single entry when the judgment could as well have been for the amount of both of the sums on which there can be no doubt that a single execution could issue. Then over and above all this the judgment provided that each and all of the plaintiffs might have execution, i. e., that separate executions for the separate amounts adjudged or a single execution for both might issue. It cannot be said that the court did not have the right to give such a direction. So it was the clerk did have authority to issue the execution. It had the authority of the court which had rendered the judgment. The case therefore is without the reason of the doctrine relied on as rendering the execution void. It must be held that this position is not well taken, and that the execution was valid.

2. Whilst the execution was in the hands of the sheriff without a levy, there was no lien for its payment on the estate of the defendant subject to levy. It is conceded, however, that by virtue of section 1660, Kentucky Statutes, an execution binds the estate of the defendant from the time of its delivery to the proper officer to execute. The effect of this is to create a lien for its payment from that time. The Court of Appeals of Kentucky in numerous decisions has recognized this. Reference may be had to only one of them.

In the case of Hood v. Pope, 233 Ky. 749, 26 S.W.(2d) 1043, 1045, it was said: "It is the general rule, in fact it is statutory law in this state, that an execution binds the estate of a defendant from the time of its delivery to the proper officer. Section 1660, Ky. Stats. The moment that an execution is placed in the hands of an officer for collection a lien is created for its payment on all of the property owned by the defendant in the execution which is not exempted by law."

In the case of In re Superior Jewelry Co. (C. C. A.) 243 F. 368, 369, it was said: "Since the jewelry in question was personal property physically within the jurisdiction of the sheriff of New York county, Teitelbaum (under ordinary circumstances) had a lien thereon, or (in the language of the statute) the property was 'bound by the execution' from the time he delivered the process to the sheriff, i. e., Feby. 15, 1916."

Indeed that such is the case is recognized by the statute. Section 1710, subd. 4, provides that, whenever a sale under execution is set aside for any cause not affecting the validity of the execution, such setting aside "shall in nowise destroy or affect the lien created by the execution or the levy thereunder." In the case of Waller v. Best, 3 How. 111, 120, 11 L. Ed. 518, it was said: "And whatever doubts might before have been entertained, we must, under the authority of this case [i. e. Addison v. Crow, 5 Dana (Ky.) 274], regard it as the settled law of the state, that the creditor obtains a lien upon the property of his debtor by the delivery of the fieri facias to the sheriff; that it acquires no additional value or force by being actually levied, but that the lien is as absolute before the levy as it is afterwards, and continues while the process remains in the hands of the sheriff to be executed."

The difference between the lien before levy and that after levy would seem to be that in the one case it is general and in the other it is specific. · The lien of the execution, however, can be enforced in but one way, and that is by levy and sale. This being so, if the execution is returned, or its return day expired without a levy, the lien is released. It is not necessary to cite any decisions to this effect, as it is well settled that such is the case. It is also well settled that if whilst an execution is in the sheriff's hands unlevied a junior execution in the hands of another and distinct officer acting under distinct and competent authority is levied the junior execution takes precedence of the senior. Kilby v. Haggin, 3 J. J. Marsh. (Ky.) 208; Million

v. Com. to Use of Withers, 1 B. Mon. (Ky.) 310, 36 Am. Dec. 580; Bourne v. Hocker, 11 B. Mon. (Ky.) 23.

The binding effect of an execution is really not due to the statute. It has come over from the common law. What the statute does is to change the time of its having such effect from the date of the execution to its delivery to the sheriff. Hence there is room for this qualification of the binding effect of an execution.

The reason therefor is thus stated in Kilby v. Haggin: "The only object of attaching a lien to an execution, is to prevent the debtor from defeating the creditor, by alienating or embarrassing his estate. The reason of the law in such a case, does not apply to a competition between execution creditors, and 'cessante ratione cessat lex.' Moreover it is but sheer justice, to give the preference to the creditor, who, by his superior industry and vigilance, shall have procured the first levy, on the debtor's estate. It would seem unreasonable, that a creditor, who had been dormant, or unwilling, or afraid to direct a levy of his execution, or to shew property, to the officer, should take the spoil from a more active and adventurous creditor, after he had found it, and, at his own hazard, shewn its liability. If such were the law, not only injustice, but fraud would be legalized."

It is possible, therefore, that if a creditor of the defendant had secured a personal judgment in this court against it, and had caused an execution to issue thereon and delivered · it to the United States marshal who had levied on defendant's stock of goods and equipment before the sheriff of Perry county had levied the state execution, that such creditor would have obtained precedence over the petitioners. What is here said as to the lien of an execution ceasing by nonlevy or a junior execution acquiring precedence over it if levied first is practically all that plaintiffs are contending for here.

It is immaterial to them that an execution creates a lien from the time of its delivery to the sheriff. But it does not follow from these contentions that the petitioners are not entitled to the relief they seek. The plaintiffs must make good their other contentions.

3. The execution was never levied. It is defendant's position that in order to be a 'valid levy of an execution on the personal property of the defendant it is essential that the officer take actual possession thereof. There must be a change of possession from the defendant to the officer. He must do some act which, if not protected by his writ,

would make him a trespasser. No doubt this is the general rule. The law on the subject is often stated in this way. But it is recognized that this is not absolutely essential in every case. Something may be done which is the equivalent of such action on the part of the officer. Where the law is thus stated, what is meant is that such is the case in the absence of the doing of that which is the equivalent thereof. All the authorities cited on behalf of the defendant recognize this. In Demint v. Thompson, 80 Ky. 255, it is said: "He [the officer] must take the possession or control of it." According to this it is sufficient if the officer take control of the property. It is not necessary that he take possession.

In the case of Whitaker v. Tiedemann, 200 Iowa, 901, 205 N. W. 468, 469, it is said: "The officer must do something which will amount to a change of possession, or which is equivalent to a claim of dominion over the property, coupled with power to enforce it."

■ Here it is sufficient that the officer do something which is equivalent to a claim of dominion over the property, coupled with power to enforce it. It is not essential that he do that which amounts to a change of possession. In the case of Chittenden v. Rogers, 42 Ill. 100, it is said: "The officer must perform some act which not only indicates an intention to seize the property, but he must reduce it to possession, or, at least, bring it within his immediate control."

Here it is sufficient that the officer at least bring the property within his immediate control. It is not essential that he reduce it to possession.

In the case of Beekman v. Lansing, 3 Wend. (N. Y.) 446, 20 Am. Dec. 707, it is said: "The goods should be brought within his [i. e. the officer's] view, and subjected to his control (Haggerty v. Wilber & Barnet, 16 Johns. (N. Y.) 288 [8 Am. Dec. 321]); and it is proper also, if not necessary, that an inventory should be taken of them. The officer should assert his title to the goods by virtue of the execution."

In the case of Jones v. Howard, 99 Ga. 451, 27 S. E. 765, 767, 59 Am. St. Rep. 231, it is said: "To the completion of a levy, seizure, either actual or constructive, is absolutely indispensable. Actual seizure is accomplished by manucaption of the thing intended to be seized. A constructive seizure is accomplished by the actual reduction by the officer of the property intended to be seized to his own control. He must have brought such property so far under his subjection that he could exercise control over it. He must exercise or assume to exercise dominion by virtue of his writ. He must do some act for which he could be successfully prosecuted as a trespasser if it were not for the protection afforded him by the writ."

What act he could do short of an actual seizure or manucaption which would subject him to prosecution as a trespasser is not indicated. But it is recognized that there may be such a thing as a constructive seizure, and that this is accomplished by the officer reducing the property to his control, i. e., bringing it so far under his subjection that he could exercise control over it or by exercising or assuming to exercise dominion by virtue of his writ.

■ Now these expressions in these several cases as to what is the equivalent of an actual seizure or manucaption the doing of which amounts to a levy are vague, and it is difficult to tell just what is had in mind. But they clearly recognize that there is such a thing as a constructive seizure which is the equivalent of an actual one, and which of itself, without an actual seizure, constitutes a levy. There are some things which it can be said do not constitute a constructive seizure. A mere viewing of the property is not such. The survey which the sheriff made of the stock of goods of the defendant in its commissary and of its equipment was not a constructive seizure. Nor did the indorsement of the levy on the back of the execution amount thereto. It is possible to go further than this and indicate what coming short of an actual seizure will amount to a constructive seizure. It is well settled that if the officer makes an actual seizure he need not retain the actual possession. He may surrender and intrust it to the defendant in the execution.

In the case of Beekman v. Lansing, supra, it is said: "But it is not necessary that an assistant of the officer should be left in possession of the goods, or that the goods should be removed. They may be left in the custody of the defendant, at the risk of the plaintiff or of the sheriff, or on obtaining, as is customary, a receiptor for their delivery."

In the case of Richardson v. Bartley, 2 B. Mon. (Ky.) 328, it was said: "We cannot doubt that the officer may, at his own risk, entrust the care and keeping of the property levied on to others, and if he chooses to risk it he may entrust it to the defendants in the execution—in either case they are his mere bailees and keepers of the property, and their possession is his possession."

Again: "To lay down the rule that would prevent the officer from leaving the property in the care of the defendant, if he could trust him, with or without bond and security, would be to establish a rule that would not only subject the defendant to heavy additional costs, in many instances, but put the officer to unnecessary perplexity and trouble. We cannot yield our assent to such a rule."

In the case of McBurnie v. Overstreet, 8 B. Mon. (Ky.) 300, it was said: "He [i. e., the officer] has a right to take the property into immediate possession, or he may leave it in the possession of the debtor or any other person, but the person holding possession after the levy would hold it as the bailee of the officer."

In the case of Hill v. Harris, 10 B. Mon. (Ky.) 120, 50 Am. Dec. 542, it was said: "He [the sheriff] was not bound to take the bricks away, but had a right, at his peril, to leave them in possession of the defendant, or in the place where he found them."

In the case of Williams v. Herndon, 12 B. Mon. (Ky.) 484, 54 Am. Dec. 551, it was said: "Nor do we doubt that if he has made a proper levy, but permits the property to remain with the defendant in the execution, or any other, on a verbal understanding to have it forthcoming on the day of sale, his possession continues so as to entitle him to the action against the bailee or any others who may convert it to their own use, and thus prevent him from subjecting it according to law to the satisfaction of the execution."

In the case of Howell, Gano & Co. v. Commercial Bank, 5 Bush (Ky.) 93, it was said: "As we construe the action of the sheriff, as shown by his return and proved by himself and others, the goods were lawfully in his custody when said arrangement was made between Dallam [the creditor] and Hart [the debtor], and the latter was in possession of them afterwards as the sheriff's bailee; and this arrangement to which Dallam seems to have assented at the urgent solicitation of Hart, did not, in our opinion, discharge the levy or affect its validity."

Such then being the case, why the necessity, in order to a valid levy, for the officer actually seizing the property? Why may he not assert his right to seize it and notify the defendant of his intention to do so, and if thereupon the defendant agrees to thereafter hold possession of the property for him as his bailee why does this not constitute a valid levy? It has been held that it does by the Court of Appeals of Kentucky in the case of Carlisle v. Wathen, 78 Ky. 365. There the sheriff met the defendant, and the latter gave up to him certain described personal property to be levied upon to satisfy an execution which he had. The sheriff thereupon indorsed the levy on the execution describing the property, and stating that it was given up to him to satisfy the execution. The property was not present, and the sheriff made no seizure of it. Subsequently a constable levied an execution from the quarterly court on the property. It was held that the sheriff's levy was valid and had precedence. The debtor apparently did no more than to state to the sheriff that he gave up or surrendered the property to be levied on, and thereupon the sheriff indorsed the levy. The defendant was treated as having agreed to thereafter hold the property for the sheriff as his bailee. The court said: "The general rule is that it is necessary to the validity of a levy upon personal property that the officers should do some act which would be a trespass but for the process."

It then said: "The reason for this rule, no doubt, is, that the parties, and especially the defendant, should know that a levy has been made and the property levied upon be known. It would be inexpedient, and might lead to fraud and oppression, if the officer was allowed to keep the fact whether a levy had been made locked up in his own breast. But when the execution defendant agrees with the officer to surrender certain property to satisfy an execution in the officer's hands, and the levy is at once indorsed on the writ, there seems to be no reason for holding that such a levy is invalid. And the rule which requires the officer to do some act which, but for the writ, would be a trespass, ought to be restricted to levies made in the ordinary way, and ought not to be applied to a case like this, in which the defendant voluntarily gives up the property and the officer at once indorses the levy."

Was then a valid levy made here with the principle applied in Carlisle v. Wathen? In determining what was done, I feel that I should accept the sheriff's testimony on this subject. It is reasonable, and is corroborated in a certain important particular. There is not the slightest room to doubt his testimony that he visited Lennut on July 2, 1929, and made a survey of defendant's property subject to levy, and on his return to his office he indorsed the levy on the back of the execution. He testified that he at once gave defendant written notice that he had levied the execution on this property just as he had

given notice of the receipt of the execution on June 17th. He mailed this notice not to Barbieux, but to defendant at Allais, Ky. Barbieux was the general manager of the Columbus Mining Company, which was operating the defendant's property, and had its office at Allais. He was also process agent of defendant, and it must be taken that defendant had an office with the Columbus Mining Company. The statute required it to have a known place of business in this state, and an authorized agent thereat upon whom process could be served. As Barbieux was its process agent, where else would be this place of business except where he was stationed, which was at the office of the Columbus Mining Company, of which he was the general manager? The evidence justifies the finding that, if he was not defendant's general manager in Kentucky, he was its superior representative there and authorized to act for it as he did act in relation to this execution. It is possible that the sheriff thought that his survey and indorsement constituted a valid levy, but it is not probable. He must have thought that something more was essential, and it is reasonable that he gave defendant notice of what he had done as he testified. It is to be noted that Barbieux failed to produce this notice as well as the former notice of the receipt of the execution. The sheriff further testified that the same day or the day after Barbieux, together with defendant's attorney, who has not testified herein, appeared at his office. He told them of his indorsement of the levy on the execution, and stated that he would take the property covered thereby into his actual custody on August 5th, the return day, and, to afford the defendant all the courtesy that he could reasonably, he was going to leave the property in its custody, and he expected it to be taken care of and to preserve it. According to his testimony he said that he would leave the property "in your custody," and that he expected "you to take care of and preserve it the best you can." The meaning of this was that he was leaving the property in defendant's custody and he expected it to take care of and preserve it as best it could. It could have meant nothing else. Neither Barbieux nor defendant's attorney had any custody of the property, and the sheriff could not have expected them or either of them to care for or preserve it. The defendant had the custody of the property through Gevedon, its store manager. It alone could retain custody of it and take care of and preserve it. It is true also that the sheriff did not testify that Barbieux and defendant's attorney or either one of them agreed to this. He was not asked as to this, but it is reasonably to be inferred that they did. I have said that this testimony of the sheriff is corroborated in an important particular, and that is as to his telling defendant's representatives that he was going to take the property into his actual custody on August 5th, the day of the return of the writ. That he did so tell them is corroborated by the fact that this suit was filed and the receiver was applied for and appointed on the early morning of that day, to wit, 8:15 a. m., Hazard time. This can be accounted for only on the ground that plaintiffs knew that the sheriff was going to act thus on that date, and no apprehension was felt that he would do so before that day. The plaintiffs could only have known of this through defendant, and it could only have known it through its representatives. If the sheriff did so tell them, it is natural and reasonable that the understanding was had that in the meantime defendant was to retain custody thereof for the sheriff as its bailee. In so far as Barbieux's testimony is in conflict with that of the sheriff, it is not of sufficient weight to cause me to hesitate in accepting the sheriff's testimony as to what took place on this occasion. I must, therefore, hold against defendant here. In my judgment the execution was levied. The defendant contends that if the execution was levied the levy was invalid because the sheriff permitted the defendant to continue selling the goods. In support of this there is cited the decision in the case of Wunderlich v. Roberts, 67 Ind. 421. It may be said that this case does support this position. The petitioners have taken no notice of it, and I am without help from them. In the case of Howell, Gano & Co. v. Commercial Bank, supra, an attachment was levied on a stock of goods in a store in operation. It was held that the attachment was released as to goods sold, but held as to those not sold. It was further held that it did not cover goods purchased to replenish those sold. The court said: "We concur in the conclusion of the circuit court, that no lien existed under the attachments on the goods acquired after they were levied."

In this case the goods sold between July 2d and August 5th were replaced by goods of about equal value. Possibly it should be taken that it was the understanding that the goods purchased were to take the place of those sold under the levy. There is enough uncertainty on this point to require a consideration of the case on the basis there was not a valid levy. It does not follow from this that petitioners are not entitled to the relief

318

they seek. The plaintiffs must go farther and make out that invalidity of the levy is fatal to their case. It is their contention that it was.

■ 4. They contend that this is so because the lien of the execution came to an end on August 5th by the expiration of the return day without a levy. It could not thereafter be enforced by a levy. What then as to the effect of this? Is it fatal to petitioners' right to relief? It may be conceded that the lien of an execution ceases if there is no levy before the expiration of the return day. This should be qualified by the statement unless a new execution is immediately sued out, which was not done here. Daniel v. Cochran's Adm'r, 4 Bibb (Ky.) 532; Webster v. Industrial Acceptance Corp., 234 Ky. 613, 28 S.W.(2d) 959.

This necessarily follows from the fact that the lien cannot be enforced in any other way than by levy and sale, and after expiration of the return day such power can no longer be exercised. The execution ceases to have life. And this may be said to be the case whatever may have been the cause of the failure to levy. It makes no difference that the cause was an injunction restraining its levy. Such is the result of the failure to levy, even though the granting of the injunction was erroneous. Mason's Ex'rs v. Holmes, 4 Bibb (Ky.) 263; Eldridge v. Chambers, 8 B. Mon. (Ky.) 411; Keith v. Wilson, 3 Metc. (Ky.) 201. These decisions go farther and hold that, if an execution which has been levied is stayed by an injunction, the levy is released and the lien of the execution terminates. But it is to be noted that where the granting of the injunction was erroneous the plaintiff in the execution is not without remedy. He can sue on the injunction bond to recover damages. In the case of Keith v. Wilson, it was said: "The plaintiffs in the execution have their recourse upon both the injunction and appeal bond for any damage sustained by the effect either of the injunction or supersedeas."

■ So here it does not follow from the fact that by reason of the expiration of the return day without a levy the petitioners lost their lien thereon that they are without remedy and are not entitled to the relief which they seek. Notwithstanding this they are entitled thereto. The failure to levy the execution was wrongfully brought about by the receiver, and it is inescapable that he should make good to them what they thereby lost. The petitioners will persist in basing their right to relief on the idea that this court in the order appointing the receiver granted an injunction

against the levy of the execution in violation of section 265 of the Judicial Code, formerly section 720, U. S. Rev. St. (28 USCA § 379). It did no such thing. They so persist in spite of the fact that I pointed out in the opinion I delivered on their motion to modify that order that no such injunction had been granted. 58 F.(2d) 302. No mention is made in the order of the judgment in the Perry circuit court or of the execution which had been issued thereon. It is true that all persons were enjoined from interfering with the receiver in the possession of the property of the defendant and with the administration of her trusts and the performance of her duties imposed upon her as receiver. But this could not be construed as enjoining the sheriff from levying the execution, and had no such intent or purpose. It added nothing to what would have been the case had no such injunction been granted. The interference enjoined would have been a contempt of court without an injunction against it; hence the decision in the case of Kline v. Burke Construction Co., 260 U. S. 226, 43 S. Ct. 79, 81, 67 L. Ed. 226, 24 A. L. R. 1077, cited and relied on by petitioners, has no application here. In that case the federal court had granted an injunction enjoining the prosecution of an action in personam in the state court between the same parties which involved the same cause of action and was nonremovable. It was held by the Supreme Court that the lower court had no right to grant the injunction, and that its doing so was in violation of the statute. We have no such case here. There are, however, some expressions in the opinion of the court pertinent here which will be hereafter quoted.

■ The wrong which the petitioners have the right to complain of was the action of the receiver after appointment. This action consisted in immediately notifying by telegram the sheriff thereof, and that this court had enjoined all persons interfering with her and warning him not to levy on or molest any property of the defendant. It was because of this that the sheriff did not on that day take actual possession of defendant's property and thereby remove any question as to his having made the levy. This she had no right to do. The sheriff had the right so to do, notwithstanding her appointment. He had this right, and she was in the wrong in thus preventing him from exercising it by virtue of the fact that the state court had acquired prior jurisdiction of the property. Because of this, it would have been wrongful for this court to have enjoined the sheriff from levying the execution and that not mere-

ly because of the statute. It would have been wrongful had there been no such statute in existence. There was nothing in the order appointing the receiver giving her authority to so act. That the state court acquired the prior jurisdiction of defendant's property by virtue of the execution in the sheriff's hands, and that because thereof neither this court nor the receiver had the right to interfere with its levy, is beyond question. The decision in the case of Bortman v. Urban Industries (C. C. A.) 4 F.(2d) 913, 915, cited and relied on by petitioners, is helpful here. In June, 1924, Berger and Joy obtained certain personal judgments against the Urban Industries in the Supreme Court of Westchester county, N. Y., and caused them to be duly docketed in the clerk's office of that county. This, under the law of New York, gave them a lien on the real estate of the defendant limited perhaps to that county to secure the judgment enforceable by execution. On July 28, 1924, Bortman brought a creditor's bill against the Urban Industries in the United States District Court for the Southern District of New York. Receivers were appointed therein, and an injunction was granted against the institution of any suits or other legal proceedings, or the levying of any executions upon any of defendant's property. Berger and Joy moved that the injunction be vacated and set aside, in so far as it operated to prevent the enforcement of their judgments against both the real and personal property of the defendant. The motion was sustained as to the realty, but denied as to the personalty. The former ruling was based on section 720, U. S. Revised Statutes, now section 265 of the Judicial Code (28 USCA § 379). The petitioners think that the making of the motion as to the realty and the sustaining of it is authority for their motion herein to modify the order appointing the receiver which I overruled. Such is not the case. In that case there was an injunction granted in violation of the statute. As long as it stood it was in the way of Berger and Joy enforcing their judgment lien on the realty by issuing execution thereon. An order setting it aside would enable them to proceed. Here there was no order granting an injunction in violation of the statute, and, if there had been, setting it aside would have been of no value to the petitioners. The receivers had taken possession of the goods on which they claimed the right to levy their execution, and the only relief which would be of any value to them was an order directing the receiver to restore the goods or account for their value. Hence I suggested that the proper course for the petitioners to pursue was to file a petition for such an order.

The ground upon which the motion was denied as to the personalty was that the judgment was not a lien on it, and an execution which would have given a lien thereon had not been issued. The state court therefore had not acquired prior jurisdiction as to the personalty, and the federal court, by the creditor's bill, the appointment of the receiver, and his taking possession of the personalty, had. That court by reason of this had the right to enjoin the issuing and levying of an execution on the personalty, and the doing so was not a violation of the statute. The court said: "It is a matter too plain to require citation that no court, whether state or federal, has any right to issue an execution against property which has passed free of lien into the care and custody of any other court. The court which first acquires jurisdiction holds it for all purposes. Consequently the sheriff would be prevented from levying upon the personalty for underlying reasons which bear no relation whatever to section 720, R. S."

It was an "underlying reason" and not "reasons" that was had in mind in the holding that the plaintiff was entitled to an injunction as to the personalty. That underlying reason was the principle stated in these words: "The court which first acquires jurisdiction holds it for all purposes."

Of course, the jurisdiction referred to is jurisdiction of property, real or personal, or, as it is generally put, the res. According to this principle, if a federal court first acquires such jurisdiction the state court has no right to interfere therewith, and it has the right to enjoin such interference. The statutory provision in question has no application to such a case. This was the ground of the holding of the court in this case as to the personalty. On the other hand, if the state court first acquires such jurisdiction, a federal court has no right to interfere with it. It has no right to grant an injunction against the state court proceeding. To do so would not only be in violation of such statutory provisions; it would be in violation of this principle. Because of it, even though there were no such statutory provision, the federal court would have no right to grant such injunction. Though the court in this case based its holding as to the realty on the statutory provision, it recognized that it was nowise dependent on it. The injunction as to it was in violation of this principle as well as of the statute. It said: "There is

no substantial difference between the right to enforce a lien by appropriate proceedings in execution and procedure by suit in order to foreclose a lien, and this court has repeatedly pointed out the impropriety of preventing by injunction on the chancery side of the court the foreclosure of mortgages affecting a defendant's realty at the time receivers were appointed."

And again: "We do not mean to say that there was nothing wrong in the receivers taking possession of the land, there being no other person but the defendant in possession at the time; but we do hold it erroneous to retain possession of that land, or attempt to retain it as against any lawful process to enforce the lien of the judgment, subject to which the receivers took whatever possession they enjoyed."

In this case, therefore, according to that principle the state court had prior jurisdiction of the realty, and the federal court of the personalty. Where this principle applies the statutory provision is of no real significance. If the federal court has prior jurisdiction, it does not prevent an injunction against interference therewith by the state court. The federal court, notwithstanding such provision, has the right to enjoin such interference. If, however, the state court has the prior jurisdiction the provision does indeed apply, but it is not needed. That principle is in and of itself sufficient to render it illegal for the federal court to grant an injunction against the proceeding in the state court. And it seems to me that in all such cases the denial of the right to the injunction should be based on this principle, and not on the statute. The cases in which the statute should be applied are cases like that of Kline v. Burke Construction Company.

It will be helpful to refer to a decision of the appellate court of this circuit and one of the Supreme Court applying this principle and quote a statement thereof from the opinion in the case of Kline v. Burke Construction Company. But in advance of so doing, it is to be noted that what they make certain is that in order to priority of jurisdiction possession, actual or constructive, is not necessary. It is sufficient that it is potential; that the taking of possession is necessary in order to the exercise of jurisdiction. In the case of Kline v. Burke Construction Company, the matter is put thus: "It is settled where a federal court has first acquired jurisdiction of the subject-matter of a cause, it may enjoin the parties from proceeding in a state court of concurrent jurisdiction where

the effect of the action would be to defeat or impair the jurisdiction of the federal court. Where the action is in rem the effect is to draw to the federal court the possession or control, actual or potential, of the res, and the exercise by the state court of jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached. The converse of the rule is equally true, that where the jurisdiction of the state court has first attached, the federal court is precluded from exercising its jurisdiction over the same res to defeat or impair the state court's jurisdiction."

And thus: "The well-established rule, to which we have referred, that where the action is one in rem that court—whether state or federal—which first acquires jurisdiction draws to itself the exclusive authority to control and dispose of the res, involves the conclusion that the rights of the litigants to invoke the jurisdiction of the respective courts are of equal rank. * * * The rank and authority of the courts are equal but both courts cannot possess or control the same thing at the same time and any attempt to do so would result in unseemly conflict. The rule, therefore, that the court first acquiring jurisdiction shall proceed without interference from a court of the other jurisdiction is a rule of right and of law based upon necessity, and where the necessity, actual or potential, does not exist the rule does not apply. Since that necessity does exist in actions in rem and does not exist in actions in personam, involving a question of personal liability only, the rule applies in the former but does not apply in the latter."

In the case of Dennison B. & T. Co. v. Chicago Trust Co. (C. C. A.) 286 F. 818, 820, it was said by the appellate court of this circuit: "The rule that the tribunal, state or federal, whose jurisdiction first attaches, holds it to the exclusion of the other until its duty is fully performed, and the jurisdiction involved is exhausted, applies to enforcement of liens against specific property, including the foreclosure of mortgages, and is not limited to cases where property has been actually seized under judicial processes before the second suit is instituted in another court. The test is jurisdiction over the res, not possession of the property."

That was a decision of the appellate court of this circuit, and it was held therein that, by virtue of a suit to quiet title, a state court took into its jurisdiction the land in question, and a federal court during its pendency had

no jurisdiction to entertain a suit to foreclose a mortgage on the land.

The latest decision on the subject is that of the Supreme Court in the case of Harkin v. Brundage, 276 U. S. 36, 48 S. Ct. 268, 271, 72 L. Ed. 457. It is of importance for its extension of the principle and the sensitiveness of that court to things that are not right in this connection. On February 14, 1925, a stockholder's bill was filed for the appointment of a receiver of a corporation in the state court. Application was made for the appointment thereof, and notice given that the motion would be presented to the court on February 16th. Nothing was then done, and receivers were not appointed until February 28th. In the meantime, i. e., on February 18th, a creditor's bill was filed in the federal court, and a receiver was appointed by it February 19th. The receiver at once took possession of the property of the corporation and was in possession at the time of the appointment of the state court receivers. Thereafter the state court receivers moved the federal court to order its receiver to turn over the property to them. The district court denied the motion, and the appellate court affirmed its action. But the Supreme Court reversed both courts and held that the state court receivers were entitled to the property and its administration, and their motion should be sustained. This decision is of value as upholding the position I have taken as to the course to be pursued by the petitioners to vindicate their right. The ground upon which the court held that the state court had prior jurisdiction was that it was prevented by chicanery from appointing a receiver before the filing of the bill in the federal court. If it had not been therefor the state court would in this way have acquired the prior jurisdiction. The court said: "The principle which should govern in a conflict of jurisdiction like this has been a number of times stated by this court. As between two courts of concurrent and co-ordinate jurisdiction, the court which first obtains jurisdiction and constructive possession of property by filing the bill is entitled to retain it without interference and cannot be deprived of its right to do so, because it may not have obtained prior physical possession by its receiver of the property in dispute; but where the jurisdiction is not the same or concurrent, and the subject-matter in litigation in the one is not within the cognizance of the other, or there is no constructive possession of the property in dispute by the filing of a bill, it is the date of the actual possession of the receiver that determines the priority of jurisdiction.".

In support of the first part of this statement, it cited the case of Palmer v. Texas, 212 U. S. 118, 29 S. Ct. 230, 53 L. Ed. 435, and as to what was held therein it said: "In Palmer v. Texas, the suit in the state court was an action by the state to forfeit the charter of the corporation and to wind up its affairs. The suit in the United States court was an action by a stockholder to liquidate the corporation. Both were substantially alike in purpose. The state court had proceeded so far as to appoint receivers of the property and had merely delayed their taking possession until the case might be examined on appeal in the court above. The state court was held to be in constructive possession all the time, and was given priority of jurisdiction over the property as against the receivers of a federal court who had taken actual possession under a subsequent bill."

The length to which the Supreme Court went in this case is emphasized by the fact that it held that, on the face of the two bills, it could not be said that the two courts were exercising concurrent jurisdiction, and hence there was room to say that the case came within the last part of the statement. It said: "Of course, as it has now turned out, because the corporation has proven to be insolvent, it would not have been difficult or be difficult now in the state court bill, by an amendment, to give the stockholder's bill the effect of a creditor's bill, with the receivers in possession. Indeed, it would seem to be its duty to do so."

The court thus expressed itself on the subject of conflict of jurisdiction between state and federal courts and the avoidance thereof:

"In this country, in which in every state we have courts of concurrent jurisdiction under the federal and the state authority, it is of the highest importance that conflict of jurisdiction should be avoided. It can only be avoided by forbearance and comity, and by enforcing upon the parties and counsel engaged the utmost good faith and the fullest disclosure in one jurisdiction with reference to what are the exact facts relevant to litigation in a corresponding case in the other. This is especially true with respect to receiverships. The desire of those who represent an embarrassed corporation to seek a refuge from active and urgent creditors under the protecting arm of an officer of the court, leads to strenuous efforts to frame a case which may under equity practice justify a receiver. More than this, circumstances which should have no influence lead the par-

ties in interest to prefer one court to another in the selection of the person to be appointed as receiver, with the hope on behalf of those in charge of the embarrassed corporation that the appointment may fall to one whose conduct will be in sympathy with, rather than antagonistic to, the previous management of the corporation, in the hands of which the embarrassment has arisen. As the Court of Appeals says, there should be no 'friendly' receiverships, because the receiver is an officer of the court and should be as free from 'friendliness' to a party as should the court itself. Nor should there be any competition or rivalry on the part of the two courts themselves in regard to assuming jurisdiction. The temptation of the exercise of power and patronage in the selection of receivers and the management of great businesses under the court should not be a feather's weight in prompting court action. Each court should examine with nicety the question of the right of the parties to have a receiver and should advise itself in regard to the circumstances making it its duty to exercise this delicate jurisdiction. If the court finds that by misrepresentation or by a false pledge another court has delayed action by which the possession of the res would have been taken before the application in hand was made, it should insist that the parties and counsel who have misled the other court must give that court full opportunity to remedy the wrong done. What was done here in delaying the state court and inducing the federal court to act without a full disclosure of what had been done in the state court, was a fraud not only upon the state court but upon the federal court itself, and when the federal court learned the method by which its jurisdiction to appoint a receiver had been invoked, it should have denied to those who were guilty the further use of its jurisdiction until after the state court had been given an opportunity to exercise the jurisdiction which it was entitled to exercise, even to taking possession of the property. As we have already said, there was, when the District Court herein came to know the facts, no party before it who was not to be charged with a knowledge of how its jurisdiction had been secured.

"It is quite true, as already said, that if there had been no chicanery in the delay of the proceeding in the state court, the difference between the two proceedings would have justified the retention of the jurisdiction by the federal court. But the two proceedings, while not the same, were closely related, and the proceeding in the state court must by the subsequent insolvency have resulted in re-framing in the state court the pleadings so as to make it a creditor's bill. Hence they were closely enough related to call upon the federal court to refuse thereafter to continue jurisdiction through its receiver, and to surrender custody of the res to the receivers of the state court. Such action we deem to have been that which the comity and the good faith of a federal court owed to the state court."

According to this principle, therefore, the state court here had acquired jurisdiction of defendant's property prior to the filing of the bill herein and the appointment of the receiver. This it did by virtue of the execution in the sheriff's hands. Possibly it is not true to say that it had constructive possession thereof. It certainly had potential possession. Actual possession was essential in order to the enforcement of the lien of the execution. It could not otherwise be enforced. Because of this priority the sheriff had the right to take actual possession of the property, notwithstanding the appointment of the receiver, and this court had no right to interfere with his so doing. Possibly an execution issued on a personal judgment of this court and levied by the United States marshal thereon before the levy of the state court's execution would have taken precedence. If so, it would be because of the law of this state that, in a contest between different executions issued by different courts in the hands of different officers, the first one levied takes precedence. But it is certain that in such a case the execution from this court would not take precedence without a levy by the marshal, i. e., by a taking of actual possession by him. The fact that it had issued and come into the marshal's hands before the levy of the state court execution would not interfere with the right to levy the latter, and its levy would give priority. If, however, the receiver in this case had taken actual possession of the property before the levy of the execution, this court would not have acquired prior jurisdiction. The priority existed in the state court by virtue of the potential possession of its execution. The principle referred to would be against it. In the case of Bortman v. Urban Industries, it was recognized that the state court had prior jurisdiction as to the realty by virtue of the lien of its docketed judgment, notwithstanding the taking of actual possession thereof by the receiver of the federal court subsequently appointed. The state court did not have any possession, actual or constructive. It merely had potential possession, and this was sufficient to give it priority of jurisdiction. It is not amiss to quote again here this statement of the court:

"We do not mean to say that there was anything wrong in the receiver's taking possession of the land, there being no other person but the defendant in possession at the time; but we do hold it erroneous to retain possession of that land, or attempt to retain it, as against any lawful process to enforce the lien of the judgment subject to which the receivers took whatever possession they enjoyed."

Here the potential possession was nearer actual possession than there. The execution had issued and was in the hands of the sheriff. But certainly this court did not acquire prior jurisdiction without the receiver taking actual possession. The mere appointment with the right to take possession was not sufficient. The case borders somewhat on that of Harkin v. Brundage, which involved another Daniel Boone corporation. The defendant assured the sheriff that the execution would be paid, and thereby affected the sheriff's activity. After so doing, it brought about this receivership proceedings to defeat the execution. The plaintiff knew nothing of the sheriff's notification that on August 5th, the last day of the execution, he was going to take actual possession. It was the defendant who knew this. It was to prevent this being done that this suit was brought, and the plaintiff must have gotten the information from defendant. It is not unlikely that the judgment procured by plaintiff against defendant was procured after defendant's notification of the issuance of the execution and was procured at its instance or facilitated by it in order to the bringing of this suit. The bill does not allege when the judgment was procured. Then defendant appeared by attorney at the time of the filing of the bill and the appointment of the receiver and filed an answer, not only consenting thereto, but praying therefor.

The plaintiffs in this connection cite the following decisions, to wit: Wiswall v. Sampson, 14 How. 52, 14 L. Ed. 322; In re Tyler, 149 U. S. 164, 13 S. Ct. 785, 37 L. Ed. 689; Wabash R. Co. v. Adelbert College, 208 U. S. 38, 28 S. Ct. 182, 52 L. Ed. 379; Kline v. Burke Construction Co., supra; Garner v. Second Nat. Bank (C. C. A.) 67 F. 833; In re Hall & Stilson Co. (C. C.) 73 F. 527; Holmes v. Dowie (C. C. A.) 177 F. 182; Gay v. Hudson River, etc., Co. (C. C.) 182 F. 279; Jackson v. Parkersburg, etc., Ry. Co. (D. C.) 233 F. 784; Pacific Coast Pipe Co. v. Conrad (D. C.) 237 F. 673; Oppenheimer v. San Antonio Co. (C. C. A.) 246 F. 934; Havner v. Hegnes (C. C. A.) 269 F. 537;

Chillicothe Furniture Co. v. Revelle (C. C. A.) 14 F.(2d) 501; Franz v. Franz (C. C. A.) 15 F.(2d) 797, 802.

None of these decisions are against the position I have taken. Indeed they uphold it in applying the principle that, in a contest between the state court and the federal court, the court which first acquires jurisdiction of the res should be allowed to exercise it without interference by the other. In each of these cases except Kline v. Burke Construction Co., which, as heretofore shown, did not involve a conflict of jurisdiction as to the res, the federal court acquired prior jurisdiction of the res and it was held that by reason thereof it had the right to enjoin the prosecution of a suit in the state court affecting the res, notwithstanding the statute. In each instance, suit in the state court was brought subsequent to the bringing of the suit in the federal court and its acquisition thereby of prior jurisdiction of the res. It is not necessary to make a presentation of each of these cases to show it. As typical of all of them, reference may be had to the last of these cases. It was there said: "It clearly appears from the allegations of the ancillary bill that the trial court in the original proceeding acquired jurisdiction over the subject-matter, in an action quasi in rem prior to the institution of the suit in the state court, and that the latter suit will impair and may defeat that jurisdiction. Such being the case, the plaintiff was entitled to a preliminary injunction."

No case has been cited and none can be to the effect that, by the bringing of a suit in a federal court for the appointment of a receiver, and the appointment thereof, that court acquires prior jurisdiction over the state court, as to the property of the defendant subject to levy under an execution which has issued therefrom and is then in the hands of the sheriff, or that it would acquire such jurisdiction even if the receiver should take actual possession thereof before the levy of the execution.

As I view it, there is no escaping the conclusion that the petitioners are entitled to the relief they seek. The evidence justifies the position that the stock of goods in the commissary on August 5th was sufficient to satisfy the execution. It is likely that, by reason of mortgages and liens on the equipment, nothing could be made out thereof by the enforcement of the execution. The petitioners are entitled to an order on the receiver directing him to pay the amount due them respectively under the execution.